The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. The first case this morning is 07-1264 H-80, Cap Wireless Incorporated, Mr. Barquist. Good morning. May it please the court. Charles Barquist for the appellant, Wavestream. Our appeal this morning presents four claim construction issues. And I'd like to start with the term slot line, which runs throughout all of the asserted claims. And what happened below in the district court, I think, is a classic instance of a limitation of a term to the illustrated embodiment in the patent. In the 240 patent, the term slot line appears without any limitation, without any adjective or modifier in the title, in the abstract, in the background of the invention, in the summary of the invention, and in the claims. But doesn't the specification disclose only single-sided slot lines? No, Your Honor. I don't think that's correct. Because, again, the term slot line, without any limitation, is used, as I just indicated, several points before we get to the illustrated embodiment. And I think that what we show, again, the issue is what does the term slot line, as in the claims and in the patent. It's a question of fact, isn't it? Well, certainly we brought a lot of factual evidence to the district court's attention. And the issue is what does that term mean to one of ordinary skill in the art? And we brought lots of evidence to the court's attention that by the time we filed these patents in 1996 and 1997, there was replete in the art. And we're not indications that slot lines embraced several variants. For example, the- Why doesn't the specification state that? Well, I think the answer, Your Honor, is that the invention is not a slot line. The invention is the power combining. And it's a combination of events. And slot lines have been in existence for many, many years. The word slot line is throughout the specification. And nowhere is there any indication that it's other than a single-sided slot line, which is, I understand if I'm not wrong, expressly described. And the only type that's expressly described. It is the illustrated embodiment. There's no question about that. Well, it's more than illustrated all the way through the written description. The only indication that references are to what I believe is called the unilateral slot line. There's never any reference to or example of the bilateral or what is the third word? The antipodal. The antipodal. We were debating how to pronounce that. You think it's antipodal rather than antipodal. That's how I've been doing it, Your Honor. But I'm not going to take the first direction. I'll do it your way, since you're the adult. As Judge Lurie was alluding to, the art certainly recognizes the three different kinds of slot lines. But your patent doesn't. Your patent only seems to recognize the one kind. And it's true that your invention is a power combiner. But it's a power combiner that consistently is based on a slot line. And the question is, if that's a limitation, what is the range of the limitation? The trial judge came up with one possible explanation. Well, I mean, the trial judge incorrectly, I think, Your Honor, said that the inventors said that the single-sided slot line, that was the illustrated environment, was the invention. And that claim is repeated in the Cap-Martin's brief. But neither Cap nor the district judge cited any evidence for that. And in fact, what is said in the specification is that the illustrated environment is according to the invention. Simply complying with the best mode requirement. Of course, an embodiment is according to the invention. But there's no statement, as there is in some of the other cases where this court has held an inventor to a statement when he says this is the invention. The 240 patent has this sentence in it. Metalizations forming the slot lines are formed on one side of the insulating substrate. It goes on. That's right, Your Honor, and I think if I recall correctly, that statement is immediately preceded by the introductory phrase, in the illustrated environment. And again, there's no requirement to illustrate more than one embodiment. And if we're going to have an embodiment illustrated, then we have to illustrate it somehow. So we've done it one way.  And there is the term slot line. And I think it's clear that slot lines, to one skill in the art at the time, had several different variants that were known. And there's no reason to limit it to just the one kind that's illustrated. I mean, we don't have just an expert who's come in and said, well, there were lots known. We've put in the record before the court several examples where several variants of a slot line are illustrated. And so if we're asking, as we must under Phillips, what does one of skill in the art, looking at the claims, which have the unadorned term slot line, what does one of skill in the art understand that to mean? I think if you look at what the art indicated, he would understand that it embraces a variety of slot lines. There's no reason to limit it. There's nothing in the specification that says it must be a one-sided slot line. Your Honor, the district court said that because the original slot line, which again, we acknowledge, the original slot line that was first invented in 1969 was the one-sided, but that the term had evolved over time, again, as we've shown in the evidence, to embrace a variety of different kinds of slot lines. The district court said that because the unadorned term was used, that it must be limited to the basic term. And I think that that is clearly mistaken. There was an interesting article just a couple of weeks ago in the New York Times Magazine by William Sapphire, which talked about this phenomenon of what are called retro games, where a word has, technology has advanced, and what was originally described, a word that described the original invention now has to be, now embraces subsequent developments. For example, simple things like a book. We now have to say a paperback book or a hardcover book. But a book embraces both. Likewise, a television. Television embraces both the original black and white TV and a color TV today. And similarly with the slot line that is used in this patent. In 1996 and 1997, when these patents were filed, it embraces all of the known slot lines that existed at the time. I'd also like to discuss the other terms that were subject to the district court's construction, which we think are mistaken. One is the term slot line module including at least one circuit element. That's in Claim 26 of the 908 patent. And the court construed that to mean at least two circuit elements, which is clearly an error. The slot line module including at least two circuit elements appears in Claim 1 of the 908. And there's no reason to construe one circuit element in Claim 26 to mean two circuit elements. Well, except for the doctrine of equivalence argument. That's correct, Your Honor. Well, Your Honor, I think we did that in several ways. The entirety of Professor Ito's expert report is really addressed to the sameness of the antipodal thin line, which is in the NCAP wireless device, and the disclosed slot line that's in the patents. And I think in this court's recent opinion in the Pace v. Coyote case, the court made clear that the entirety of the expert's testimony or report in this instance must be considered. Did that elucidate a functionary result? I think it did, Your Honor. I think it's clear from a fair reading of the entirety of Professor Ito's report. What does it have to say about weight, for example? The weight, the difference. Your Honor, it's so-called equivalence argument. Well, what it said, the way is very simple. The function of a slot line, whether it's a one-sided or antipodal slot line or thin line, is to simply transmit a signal or this microwave energy from one point to another point. The way it's done is by channeling the energy in a gap between the metallizations. And the result is simply that the signal or the energy is transmitted. It's very simple. I mean, it's really no more complicated than that. I think Professor Ito's report explains that. He does it in his own words. I mean, this is an expert. This is not a lawyer-written report. I think if the court reads that, you'll see that. This is just... These are legal proceedings, though. It's the job of lawyers to translate what technical people state into legal concepts. That's true, and I think that's what we did in our brief when we illustrated how Professor Ito's report meets those requirements. And then, clearly, if we got it to the jury, we would do that for the jury, using the substance of what Professor Ito has said. But in addition... Did you pull all this together for the benefit of the trial? We did, Your Honor. We submitted a brief directly addressing the doctrinal equivalence issue after the claim construction order came out. We did. In addition to the Ito report, there's additional evidence, which I think also makes clear that the grant of summary judgment on doctrinal equivalence was incorrect. Among other things, there's the e-mail from Mr. Abramson, who is the CEO of Cap Wireless. And that e-mail is in evidence. It's A741. And it shows that Cap substituted their antipylofin line for the slot line for a, quote, similar purpose. That substitution itself should raise a sufficient issue about summary judgment to require reversal here. Your Honor. I'm sorry. I'm just going to ask, before you sit down... Yes. ...as the presiding judge is about to tell you, come back to Judge Lurie's early question. The issue of whether a slot line was one, two, or three variants of slot line, the question in fact, do you owe some deference to Judge Farrell on that issue? Well, I think that that's an interesting question. I know that that's a matter of some debate among members of the Court. But I think the current law of the Court is that you don't. And secondly, I would say that even if you were inclined to do so, in this instance, because you have all of the evidence before you, that it's clear that Judge Otero was mistaken in the conclusion he reached. It is not true that the inventors said that the unilateral slot line is the invention. That was a key finding of Judge Otero. Your view is clearer than any event. I would see that as yes, Your Honor. Thank you. Can we just? Oh, yeah. Just a second. Good morning. I'm Bob Camorris. I represent the CAC Law Office. And I'd like to start out by saying that in Bitronix this quarter, told us that the public record, if in certain cases the public record unambiguously described the scope of the patented invention, and in such a case reliance on extrinsic evidence is improper, that the public has a right to rely on the public record such as the patent and the patents and the file history. And for that reason, Wavestream's urging this court and the district court below to set aside the intrinsic record for the purpose of looking at the extrinsic evidence of which they produced a mighty volume is simply improper and it invites error. There's two ways to affirm the judgment on literal infringement in this case. One is the slot line way and one is the plurality of devices and slot line module and array of slot line modules, constructions that the court provided. I think it's important to keep in mind that on a summary judgment of non-infringement, to keep in mind the accused device and the structure of the accused device is quite important. So I'd simply like to say and cite to the appendix here at page 786 and 780, see two undisputed facts of great importance concerning the accused device. First is that each module has only one circuit element. In no case does it have more than one. Also, it's important to note that the modules are radially aligned around the origin of the central section of the device. I'd like to move on to some of the arguments that were brought. The relevance of that point being? That in the second prong of non-infringement under plurality of devices, because there's only one circuit element in the module of the accused device, that device cannot infringe under those point constructions. Your argument is we don't have to even decide the slot line? Well, there's two co-equal ways to affirm the judgment. That's all I can say. You can affirm it on slot line. Why isn't the answer yes in your opinion? You're avoiding the answer yes. Well, I'm not trying to avoid it. I just don't think that there's an either or red light, green light situation. They're both co-equal. Are they co-equal in terms of the difficulty of interpretation, or are you saying one's easier than the other? I don't think there's any difficulty in interpretation for either prong. I think slot line is just as clear as array and multiplicity of circuit elements. Not helpful, but good. Well, I apologize. Maybe I didn't understand the question. I'd like to go through a few points in Wasting's reply brief because this is my chance to do that. They refer on page 4 of their brief to figure 1 of the 240 patent, and they say that it does not show any slot lines. I would like to direct the court's attention to figure 1, and it shows a reference, number 34, which is called out in column 4, line 66 at appendix page 855, in which it says a plurality of slot line transition cards, each generally denoted by reference number 34, are then radially disposed between the gap, et cetera, et cetera. So the specification keys to 34, 34 keys to diagram 1, and that shows that they're incorrect, that figure 1 does not show any slot lines. I'd like to talk somewhat about column 5 of the 240 patent and what it means. As we know, the 240 patent is a continuation in part from the 908 patent. Both of those patents ensue. The 240 patent incorporates by reference the entirety of the 908 patent. And on column 5 of the 240 patent, this is in the appendix at page 856, reading from the paragraph that contains the description of a slot line being made up of metalizations forming slot lines on one side of an insulated substrate. What the patentee says here is the slot line cards described herein are identical to those described and shown in the above-denoted parent application. So they're not merely saying, oh, this is one embodiment. They're saying that what I'm telling you about what a slot line is describes the way I've used the term in the entirety of the parent application, which is the 908 patent. This is not merely a preferred embodiment idea. This is where he's calling out and telling the world what a slot line means, as he has used that term. Well, let me ask you this, counsel. If the inventors are inventing this machine and they want to describe slot lines generically, what word would they use other than slot line? Well, I think a nice paragraph in here that references some of this voluminous prior art that Mr. Barquist has found during the litigation would have been useful. All they had to do, instead of engaging in a post-hoc etymological explanation of how the term got to be generic and cover a whole bunch of other things, all they had to do was say that in the application and everybody would have known it. As it is, they didn't do that. I mean a paragraph stating by slot lines we mean single-sided slot line or double-sided slot line or the name of the code. Yes, indeed. That's all they would have had to say. Then there would be no doubt in the public mind what it meant. As it was, they narrowed it and they narrowed it repeatedly. So do you think when there is a doubt in the public mind, the doubt should be held against the inventor? Is that what you're saying? Well, I... It could. This is one of those cases. This is not the first case, in fact. There was one earlier this week in which it could go either way because the written description was ambiguous and the language of the claim was not specific. And the question is which way should the doubt go? Are you suggesting a rule of law that says when there is an ambiguity, it should be held against the inventor so that the public can assume the narrowest possible interpretation rather than the broadest possible? I'm not really saying that. You're not really saying that. What are you saying? What I'm saying is that the precedents that lawyers in the public have to follow are the ones that say you look at the intrinsic evidence, you look at the specification as a whole. We've done all of that. We've done all that. We're still confused. Then what do we do? Well, I don't think that's this case, Your Honor, but if you're still confused, then the court has to resort to the admissible extrinsic evidence, including expert opinion, and use that to see if the court can resolve the ambiguity. That's what the precedents of this Court are saying. That's what happened under such hypothetical. But I thought you were arguing that it was the intrinsic evidence that resolves the ambiguity. I am indeed. I am thoroughly and completely arguing it. We've talked. There are some other points I'd like to make in brief. One is that I was sort of accused of misleading the district court into believing something about thin lines and slot lines being different. I addressed it this way. I don't think I misled the district court in the slightest, and I think it would have been pretty hard for anybody to mislead this particular judge. But thin lines is not a claim term. The court doesn't have to construe it, and I think that any time that's spent on briefing the similarity between a thin line and a slot line is not really important for the issues that this court has to decide about the meaning of the claim term slot line. All right. I'd like to talk a little bit about their briefing. In Clive Brief Room 13, they talk about the figure 3A and the formula of the 240 pattern. This optimization formula appears in both the 908 pattern. It appears in the 240 pattern. And I just want to be sure that our point was clearly understood. For an antipodal structure, you would have to, in order to optimize it or even really build it, you'd have to consider the Z direction, thickness of the substrate. And this formula, and nowhere in the specification of either pattern do they talk about optimization concerning the thickness. Their reading of, their taking of the language of the specs here is just, it's either a misunderstanding or it misconstrues what's going on. You can see by the drawing that there's only two directions here. It's X and Y. This is a mathematical diagram. It's not a physical diagram, and it doesn't count. It doesn't include the thickness of the substrate. To clarify this, you can look at the 908 pattern, column 10, lines 1 through 2 at appendix 50. You could also look in the 240 pattern itself and claim. Although they use, I guess my point is this, although they use the term thickness, they don't mean that. You can tell that from the context of the pattern. I'd like to move on to the plurality of devices and the array of slot line modules. Before you get to that, let me ask you to jump ahead. You handled this case at the trial. I did. Well, there was no trial. I'm sorry. Well, some rejections. I did. Talk to us just a minute about how the Doctrine of Equivalency was developed. Okay. Thank you. The pleadings in the Rule 26 report didn't mention the Doctrine of Equivalency, so we're proceeding in discovery under the schedule that had been told us by the court. So the discovery was to cut off on May 16th. On May 1st, I asked a set of interrogatories, two-way streaming, to ask for their infringement contentions and evidence supporting it, as well as on all grounds, literally the Doctrine of Equivalence. It was the way the interrogators were phrased. There was one interrogator for the 908, another one for the 240. They answered those interrogators on May 1st, and all they said is we reserve the right to assert a Doctrine of Equivalence case. That tells me two things. They didn't tell me what the case was. You're obligated to do that under Rule 26. It's their claim, an infringement case. And not only that, but when you reserve the right to do something, it means you haven't done it yet. And so they had no case as of May 1st. Discovery cut off was in two weeks. If they come up with a case between May 1st and May 16th, they needed to tell me that by supplementing their interrogatory responses, and their duty to supplement is specified by Rule 26, and it's also in the 26th report. We agreed about how that would be done. So after that time, I didn't hear anything more about the Doctrine of Equivalence than I had expected. We got down to expert reports. They had the first report on infringement. My expert, I was to come in on the bottom. So we got Dr. Ito's report. We see nothing about the Doctrine of Equivalence except a statement in the report that he knows what it is. But then he goes into some general descriptions, and he goes on to his literal infringement. My idea is that he expresses, and he says nothing about the Doctrine of Equivalence. He doesn't say anything about substantial similarity. That word's not in there. Function, way, result, that's not talked about at all. So when we did the rebuttal report of Dr. Eisenhardt, you won't find part of the rebuttal report that rebuts a Doctrine of Equivalence case because there isn't a Doctrine of Equivalence case to rebut. So we did nothing on it. So we went on to summary judgment time. We filed our motion for summary judgment of non-infringement. They opposed it. And in their opposition, for the first time, they said, oh, well, gee, even if you rule on literal infringement, you can't rule on Doctrine of Equivalence because they haven't moved for that. My response was, well, what Doctrine of Equivalence case were you talking about? At that time, if they had signaled, well, gee, we have a Doctrine of Equivalence case, supplement interrogatories, move to amend expert report, and these kinds of things that you would expect your opponent to do in a litigation to put you on full and fair notice of their main intentions in the infringement case, then we wouldn't be really having this issue. They did none of those things. So we went on with the briefing as it was. It was our position that they didn't have a Doctrine of Equivalence case. In December, at a case management conference, Judge Otero specifically addressed this. He felt that he needed more briefing on the Doctrine of Equivalence, so he reopened the briefing. The Wave Street agreed that they did not need to supplement their evidence, and so they went forward with a briefing schedule. They briefed it. We responded. The judge found that the evidence that they had cobbled together from Dr. Ito's report did not lay out a Doctrine of Equivalence case that was sufficient to meet the guidance of this court, that a Doctrine of Equivalence infringement case must be made by specific testimony and linking argument on either the substantial similarity ground or the functionally result ground. This wasn't there. I don't think that there's any reasonable grounds for disputing on that. Thank you. Yes, very briefly. On the Doctrine of Equivalence point, we did not ask to supplement the record because we didn't want to have an issue of prejudice or last-minute stuff, but we did explain to the district court how Professor Ito's report considered as a whole, which, again, the Pace v. Toyota case, I think, makes it clear that it should be done because it's not necessary to repeat direct infringement arguments or literal infringement arguments or explicitly incorporate them in a discussion about the DOE. In addition, as I said earlier, there's lots of evidence even beyond Professor Ito's report that supports the equivalence. The Roberts patent explains how the impedance transformation takes place in both the non-coplanar and the coplanar slot line in much the same way. The Alfred article explains that Professor Ito's spectral domain admittance method and analysis can be used for all kinds of slot lines of various types. The Gupta book indicates that antipodal thin lines are suitable for transitions between a microstrip and a waveguide, and that's exactly what the 908 patent says, that the slot line that's disclosed in that patent is supposed to do, to transition between a waveguide and a microstrip. So again, there's lots of evidence that indicates equivalence between the two types of slot lines. The extrinsic evidence that we brought in is properly considered under Phillips, and again, it's not inconsistent or intended to contradict the extrinsic evidence. It's intended to do what Phillips says we should do, which is to find out what one of skill in the art would understand the claim term, the unadorned claim term, in this case, slot line, would mean. And my time is up. Thank you very much.